## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FILOMENA LAMBAKIS,** | : | **Civil No.  1:22-CV-1370** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **KILOLO KIJAKAZI**, | : | |
| **Acting Commissioner of Social Security** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.    Introduction

The Supreme Court has underscored for us the limited scope of our substantive review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999)

(comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

Filomena Lambakis applied for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act on December 1, 2016, alleging an amended onset date of disability of March 16, 2016. A hearing was held before an Administrative Law Judge ("ALJ"), and the ALJ found that Lambakis was not disabled during the relevant period and denied her application for benefits. Lambakis appealed to this Court, and the ALJ's decision was remanded for further consideration. A second hearing was held on April 29, 2021, and the ALJ again denied Lambakis' claim for benefits. Lambakis now appeals this decision, arguing that the ALJ's decision was not supported by substantial evidence.

However, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner.

## II.    Statement of Facts and of the Case

Lambakis filed her claim for disability benefits on December 1, 2016, alleging an onset date of disability of January 1, 2005. Lambakis later amended her alleged

2

onset date to March 16, 2016. (Tr. 963). Lambakis alleged disability due to the following impairments: mental health issues, neck and back pain, and carpal tunnel syndrome. (Tr. 181). She was 51 years old at the time of her alleged onset of disability, had a high school education, and had no past relevant work experience. (Tr. 977).

With respect to Lambakis' impairments, the medical record revealed the following: Lambakis suffered from depression, anxiety, and PTSD during the relevant period. On this score, Lambakis underwent a mental status examination with Dr. Karen Plowman, Psy.D., in March of 2017. (Tr. 772-76). Dr. Plowman's examination revealed that Lambakis had clear and goal-directed speech, adequately developed social skills, coherent and goal-directed thought processes, a dysphoric affect and a dysthymic mood, adequate attention and concentration, somewhat impaired recent and remote memory skills, and good insight and judgment. (Id.)

The record indicates that Lambakis treated with Ted Hummel, M.S., for her depression and anxiety beginning in August of 2017. (Tr. 837). Treatment notes from this time note that Lambakis had been "pushing through" her depression, and that she had a little brighter affect. (Tr. 835). In September, it was noted that Lambakis had just returned from a two-week trip to Italy with her family. (Tr. 833). She reported feeling less depressed. (Tr. 834). In October and November, she

reported feeling bitter, angry, and depressed, but her therapist noted no significant behavioral or functional changes. (Tr. 827-29). It was noted, however, that she experienced back pain, but that physical therapy was helping a little. (Tr. 830). She resumed therapy in December "after a brief hiatus." (Tr. 824).

In January of 2018, it was noted that Lambakis had a good Christmas, but that she presented with a sad and depressed mood. (Tr. 822). At a later appointment that month, she reported feeling less depressed, and it was noted that she had a brighter affect. (Tr. 820-21). In February, treatment notes indicated that Lambakis was "a little happier and less stressed." (Tr. 818). However, it was noted in March of 2018 that she was feeling depressed, and that she was struggling with her chronic pain. (Tr. 816-17). At an appointment in April, she was tearful and sad, but no significant behavioral or functional changes were noted. (Tr. 814). At this same time, treatment notes from her primary care physician state that Lambakis felt her anxiety and depression symptoms were "reasonably controlled at present," and that she felt well and had no new complaints. (Tr. 134, 136).

Mr. Hummel filled out a mental residual functional capacity assessment in May of 2018. (Tr. 868-72). Mr. Hummel opined that as of December 2017, Lambakis had moderate to marked limitations in understanding, remembering, or applying information; moderate to extreme limitations in interacting with others;

4

moderate to marked limitations in sustained concentration, persistence, or pace; and moderate to extreme limitations in adapting or managing oneself. (Id.) Mr. Hummel further opined that Lambakis would be off task 15% of the time and would likely be absent 2 days per month but circled "yes" indicating that he believed Lambakis could work on a regular and sustained basis in light of her mental impairments. (Tr. 872).

In July of 2018, Lambakis again reported to Mr. Hummel that her anxiety and depression were stable on her current medication regimen. (Tr. 139). Lambakis then underwent an assessment at Philhaven in September of 2018 with another therapist, as Mr. Hummel had retired. (Tr. 98). This assessment noted that Lambakis was employed at that time at her family's pizzeria. (Id.) A brief mental status examination was performed, which indicated that Lambakis had a calm and cooperative attitude; normal rate, tone, and volume of speech; a depressed and tearful affect; an anxious and depressed mood; goal directed and logical thought processes; intact short term and long-term memory; and fair insight and judgement. (Tr. 100). At a follow up in October, Lambakis presented with an anxious and depressed mood with racing thoughts, and she reported disrupted sleep, poor appetite, fatigue, loss of interest, and internal feeling of doom. (Tr. 1294). In November, she described herself as feeling "broken" and "not good enough," and she presented as depressed, anxious, and tearful. (Tr. 1288-89). At a follow up in December, Lambakis reported increased

5

depression and anxiety due to being physically ill, and it was noted that she had low energy, poor appetite, disrupted sleep, and excessive worries. (Tr. 1473-74). At a visit to her primary care doctor in January of 2019, her physician noted that she appeared to have some seasonal affective disorder and adjusted her Paxil dose. (Tr. 1648).

At a follow up appointment at Philhaven in March of 2019, Lambakis reported being less irritable but still anxious and depressed. (Tr. 1460). She presented as depressed, anxious, and tearful with racing thoughts. (Tr. 1461). By May of 2019, Lambakis reported worsened anxiety and depression, and treatment notes reflect that she had been in an automobile accident around this time. (Tr. 1452). She presented as anxious, depressed, and tearful, and she had low concentration. (Id.)

With respect to her physical impairments, the record shows that Lambakis suffered from back, leg, and neck pain, as well as carpal tunnel syndrome during the relevant period. On this score, a March 2016 X-ray of the lumbar spine showed no acute fracture of the lumbar spine and grade 1 spondylolisthesis of L5 on S1 with bilateral L5 pars defects. (Tr. 526). At that same time, an X-ray of the left knee showed no acute fracture or dislocation. (Tr. 527).

Treatment notes from Drayer physical therapy in April of 2016 indicated that Lambakis was not doing her exercises as she was supposed to, but that her back felt

better when she did. (Tr. 928). Physical therapy notes between April and May of 2016 indicated that Lambakis continued to present with decreased back pain throughout therapy. (Tr. 897). However, it was noted in May that she experienced increased fatigue from carrying serving trays at work, which strained her lumbar spine. (Id.) Lambakis' discharge summary from Drayer in May of 2016 noted that Lambakis continued to experience some back pain and had moderate difficulties with heavy activities, recreational activities, heavy household chores, and prolonged standing. (Tr. 879). However, she was reported as remaining at a functional level with her activities of daily living and work. (Tr. 882).  In August of 2016, Lambakis complained of worsening neck and arm pain with intermittent numbness and tingling. (Tr. 664). She was scheduled for an MRI. (Id.) The September 2016 MRI of her cervical spine showed multilevel cervical degenerative disc disease/osteoarthritis, multilevel forminal narrowing, and T4-T5 disc protrusion/extrusion visible on saggital images. (Tr. 519-20).

Lambakis underwent an internal medicine examination with Dr. Ahmed Kneifati, M.D., in March of 2017. (Tr. 782-85). Dr. Kneifati diagnosed her with cervical and lumbar radiculitis, bilateral carpal tunnel syndrome, and a history of anxiety and depression. (Tr. 785). On examination, she had a normal gait, could walk on her toes and heels with some difficulty on her heels, was able to rise from a chair

7

without difficulty, and needed no help changing or getting on and off the examination table. (Tr. 783). Dr. Kneifati noted no abnormality in her thoracic spine, no evident joint deformity, no effusion, but noted a positive straight leg raise test. (Tr. 784). Lambakis had mild edema in her lower extremities but no muscle atrophy. (Id.) With respect to her hands, Dr. Kneifati found that her hand and finger dexterity were intact she had 5/5 grip strength bilaterally, and she was able to zip, button, tie laces, and Velcro. (Id.)

In July of 2017, Lambakis' primary care provider indicated that her chronic back pain was becoming more of an issue, and that she had been having neck pain radiating up the back of her head, as well as numbness and tingling in her arms. (Tr. 118). However, on examination, she had normal cervical spine range of motion and normal upper and lower extremity strength. (Tr. 121). At a September 2017 visit, Lambakis denied any musculoskeletal symptoms. (Tr. 151). In October, Lambakis reported that she had no new complaints and that she was feeling quite well. (Tr. 123). She had no leg edema, and it was noted that her medications were working well. (Tr. 124-25). Lambakis had an X-ray of her lumbar spine in November of 2017, which showed degenerative disc disease primarily at L5-S1 as well as grade 1 spondylolysis at L5 on S1. (Tr. 48). An MRI from this time showed diffuse

degenerative changes most severe at L5-S1 and multilevel disc bulging without any focal disc extrusion, as well as partial foraminal stenosis. (Id.)

In January of 2018, Lambakis presented with lower back and bilateral leg pain. (Tr. 838). It was noted that she was working at her family's restaurant and was on her feet for long periods of time. (Id.) Treatment notes indicate that heat helped her pain, as well as anti-inflammatory medications and physical therapy. (Tr. 838-39). On examination, her lumbar paraspinals and facet joints were mildly tender, and she had limited range of motion in her lumbar spine with pain in flexion and extension. (Tr. 841). However, she had a negative straight leg raise test. (Tr. 842). Lambakis began to receive steroid injections for her pain. (Tr. 844). In February of 2018, Lambakis presented to her primary care doctor complaining of right knee pain. (Tr. 128). Her physician noted a history of a torn right meniscus ten years prior. (Id.) On examination, she had minimal joint effusion and medial joint line tenderness but no lower leg edema. (Tr. 129).

Lambakis complained of right knee pain in March of 2018, and she was diagnosed with arthritis of both knees. (Tr. 811). She was given a topical gel for her pain. (Id.) Meanwhile, Lambakis continued to receive injections for her back, (Tr. 851), and in April of 2018, she reported that her back pain was tolerable. (Tr. 859).

Indeed, a physical examination in April revealed no gait problem but limited range of motion in her lumbar spine. (Tr. 45-46).

In May of 2018, Steve Broker, a physical therapist, filled out a functional capacity evaluation. (Tr. 939-49). Mr. Broker recommended that Lambakis be limited to working part time in the light exertional category or full time in the sedentary exertional category. (Tr. 939). Mr. Broker noted that during the examination, Lambakis was able to maintain concentration and follow instructions and had no difficulty communicating effectively. (Tr. 945). Lambakis ambulated with a mild limp, and her range of motion in all extremities was noted to be within functional limits. (Tr. 948). She had 4/5 strength in her bilateral lower extremities, but her motions were limited by lower back pain. (Id.) She further exhibited positive Tinel's signs for carpal tunnel syndrome and a negative straight leg raise. (Id.)

Treatment notes from September of 2018 indicate that Lambakis was experiencing severe pain in her back after having squatted to reach something. (Tr. 68). It was noted that she was concerned because she was leaving for a trip to Paris in one month. (Id.) A physical examination revealed no gait problem but limited lumbar spine range of motion with pain in extension and tender SI joints, as well as a positive Patrick's test but a negative straight leg raise test. (Tr. 71-72). She received an injection in her cervical and lumbar spine. (Tr. 72). An examination from

10

November of 2018 similarly revealed no gait problem but exquisite tenderness in the cervical paraspinal and upper trapezius muscles, and she continued to receive injections. (Tr. 1411). Treatment notes from March of 2019 indicated that Lambakis had exquisitely tender and tight cervical and thoracic paraspinals and upper trapezius, limited range of motion in her lumbar spine but normal cervical spine range of motion, and an antalgic gait but no assistive device. (Tr. 1404-05). Lambakis received another spinal injection at this time. (Tr. 1405). In May of 2019, it was noted that Lambakis was continuing to receive injections and that they provided some relief. (Tr. 1388). She reported no back or neck pain, but she exhibited an antalgic gait. (1389). She was told to continue heat therapy and anti-inflammatories, and it was suggested she purchase a TENS unit. (1394).

It is against this medical backdrop that the ALJ held an initial hearing on Lambakis' claim on June 25, 2018, at which Lambakis and a vocational expert testified. (Tr. 153-80). Following this hearing, the ALJ denied Lambakis' claim for benefits. (Tr. 18-37). The Appeals Council denied Lambakis' appeal. (Tr. 1-7). Lambakis then appealed to the United States District Court for the Middle District of Pennsylvania, and Magistrate Judge Schwab remanded the case for further consideration. (Tr. 1046-73). Specifically, Judge Schwab found that the ALJ's treatment of the opinion of plaintiff's treating therapist, Mr. Hummel, was not given

adequate consideration. (Id.) Accordingly, the case was remanded to the ALJ, who held a second hearing on April 29, 2021. (Tr. 985-1008).

At this hearing, Lambakis and a vocational expert testified. (Id.) Lambakis testified that during the relevant period, she worked at her family's pizzeria five days per week for five hours per day. (Tr. 992, 995). She testified that she suffered from anxiety, depression, and panic attacks on a daily basis, which made it difficult for her to focus or concentrate. (Tr. 990). She stated that she could not identify specific triggers for her panic attacks, but that they drained her and caused her to be fatigued, and that it took longer for her to get things done. (Tr. 991, 993). She further reported that her depression worsened due to her chronic pain, and this caused her to stay in her house all day and sometimes miss work. (Tr. 994). She stated that injections helped with her back pain, but that she could only sit for 30 minutes before having to get up and walk around. (Tr. 996). Lambakis lived with her son, who helped her with household chores such as cooking, cleaning, and doing laundry, particularly because her carpal tunnel prevented her from grabbing things. (Tr. 998-99).

Ultimately, the ALJ denied Lambakis' claim for benefits. (Tr. 960-84). In that decision, the ALJ first concluded that Lambakis met the insured status requirements under the Act through December 31, 2025, and she had not engaged in any substantial gainful activity since her alleged onset date of disability. (Tr. 965). At

Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Lambakis had the following severe impairments: carpal tunnel syndrome (bilateral), degenerative disc disease, degenerative joint disease, major depressive disorder, and post-traumatic stress disorder. (Tr. 966). At Step 3, the ALJ determined that Lambakis did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 966-70). With respect to her mental impairments, the ALJ found that Lambakis was moderately limited in understanding, remembering, or applying information; concentrating, persisting, or maintaining pace; and adapting or managing oneself, and found her mildly limited in interacting with others. (Id.)

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity ("RFC"), considering Lambakis' limitations from her impairments:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). She is capable of frequent postural movements except occasional ladders, ropes, and scaffolds. She is capable of frequent handling/fingering bilaterally. She must avoid concentrated exposure to vibration. Work that is limited to simple and routine tasks, involving only simple, work-related decisions, and with few, if any, work place changes, and no production pace work.

(Tr. 970).

Specifically, in making the RFC determination, the ALJ considered the medical evidence, medical opinions, and Lambakis' testimony regarding her impairments. On this score, regarding Lambakis' mental impairments, the ALJ considered the March 2017 opinion of Dr. Karen Plowman, Psy.D., and gave this opinion great weight. (Tr. 974-75). Dr. Plowman opined that Lambakis had no limitations in understanding, remembering, or carrying out simple instructions, her ability to make judgements on simple work-related decisions, her ability to interact appropriately with the public, or her ability to respond appropriately to changes in the work setting; and she had moderate limitations understanding, remember, or carrying out complex instructions, the ability to make judgments on complex work-related decisions, and her ability to interact appropriately with supervisors and coworkers. (Tr. 777-78). The ALJ gave Dr. Plowman's opinion great weight, reasoning that it was consistent with the claimant's longitudinal medical records, which included normal mental status findings such as a euthymic mood, appropriate affect, normal motor behavior, clear speech, coherent thought processes, and good insight and judgment. (Tr. 975). The ALJ also considered the opinion of Dr. Richard Williams, Ph.D., who opined in March of 2017 that Lambakis did not suffer from any severe mental impairment. (Tr. 187). The ALJ gave little weight to this opinion

14

because it was not consistent with the evidence pertaining to Lambakis' documented mental impairments, which included abnormal clinical findings. (Tr. 975).

The ALJ also considered the May 2018 opinion of Ted Hummel, M.S., Lambakis' treating therapist during the relevant time, and gave this opinion little weight. (Tr. 976). On this score, the ALJ reasoned that Mr. Hummel's opinion was not consistent with documented evidence in the record which showed normal mental status examination findings, such as normal rate, tone, and volume of speech, logical thought processes, and intact short and long-term memory. (Id.) Additionally, the ALJ noted that Mr. Hummel opined that these limitations began in December of 2017, more than a year after the alleged onset date, and further, that the records indicated that Lambakis did not consistently treat with him biweekly. (Id.) Moreover, the ALJ noted that Mr. Hummel's limitations were not consistent with the objective mental health findings of Lambakis' primary care provider who prescribed her mental health medication. (Id.)

Regarding her physical impairments, the ALJ gave the March 2017 opinion of Dr. Ahmed Kneifati, M.D., partial weight. (Id.) Dr. Kneifati opined that Lambakis could lift and carry up to 10 pounds frequently and up to 20 pounds occasionally; could sit for 5 hours and stand/walk for 3 hours in an 8-hour workday; had no manipulative limitations; and she could occasionally climb ladders or scaffolds and

15

could frequently perform all other postural movements. (Tr. 786-89). The ALJ reasoned that Dr. Kneifati's lifting and carrying limitations were supported by records indicating Lambakis had 5/5 strength in her extremities and no muscle atrophy, but that his sit/stand/walk limitations were not fully consistent with the record. (Tr. 975). The ALJ reasoned that one of the reasons for these limitations in Dr. Kniefati's opinion was Lambakis' carpal tunnel syndrome, which would not affect Lambakis' ability to sit, stand, or walk, and that his positive straight leg raise notations were not consistent with records indicating normal straight leg raise tests. (Id.) Accordingly, the ALJ gave this opinion partial weight.

The ALJ also considered the opinion of the state agency medical consultant, Dr. Kevin Hollick, D.O., and gave this opinion great weight but further provided for other limitations consistent with the record. On this score, Dr. Hollick opined that Lambakis could perform light work, in that she could sit, stand, and walk up to 6 hours in an 8-hour workday; could occasionally climb ladders, ropes, or scaffold and stoop, and could frequently climb ramps and stairs, balance, kneel, crouch, and crawl; and she should avoid concentrated exposure to vibration. (Tr. 189-90). The ALJ noted that this opinion was generally consistent with the evidence, in that records showed Lambakis had a normal gait and station, 5/5 strength in her upper and lower extremities, some negative straight leg raise tests, and 5/5 grip strength.

(Tr. 976). However, the ALJ provided for more manipulative limitations given that he found Lambakis' carpal tunnel syndrome to be a severe impairment. (Id.)

The ALJ also considered the opinion of Mr. Broker and gave this opinion little weight. (Tr. 977). The ALJ reasoned that Mr. Broker's limitations were not consistent with objective clinical findings of a normal gait, station, and balance, 5/5 strength in her upper and lower extremities, and no muscle atrophy. (Id.) Finally, the ALJ gave little weight to the opinion of Dr. Spotts, who opined in 2013 that the plaintiff was disabled from March 2005 through 2015. (Id.) The ALJ reasoned that this opinion did not encompass the relevant time period, and further, that the determination of disability is left to the Commissioner. (Id.)

The ALJ also considered Lambakis' testimony but ultimately found that Lambakis' complaints were not entirely consistent with the medical evidence of record. (Tr. 971-74). As for her physical impairments, the ALJ recognized that the record contained abnormal findings such as difficulty walking on her heels and toes, positive straight leg raise and Patrick's tests, tenderness, and limited range of motion in her lumbar spine, and tenderness of her knees. (Tr. 972). However, the ALJ also noted that Lambakis' statements were not fully consistent with the records showing normal gait, station, and balance, 5/5 muscle strength in her extremities, negative straight leg raise tests, 5/5 grip strength bilaterally, and normal range of motion in

her wrists, hands, and hips. (Id.) The ALJ further noted that despite her alleged difficulties with sitting, standing, and walking, Lambakis worked part time, traveled to Italy, and reported doing a lot of yardwork during the relevant period. (Tr. 973).

As for her mental impairments, the ALJ noted the abnormal findings in the record, such as dysphoric affect, dysthymic mood, a somewhat impaired recent and remote memory, and a depressed mood. (Tr. 973). However, the ALJ further noted that the record also reflected findings of a euthymic mood, appropriate affect and eye contact, normal speech and motor behavior, coherent thought processes, and good insight and judgment. (Id.) Moreover, during examinations with a physical therapist, Lambakis exhibited a pleasant and cooperative mood, she was able to follow instructions and maintain conversation adequately. (Id.) Additionally, treatment records from Philhaven noted that throughout 2017 and 2018, Lambakis reported that her depression and anxiety were stable and that she felt quite well. (Tr. 973-74). Further, treatment notes from early 2018 reflected that Lambakis was happier and less stressed, and that her depression and anxiety were reasonably controlled. (Tr. 974). Accordingly, the ALJ ultimately found that Lambakis' complaints were not entirely consistent with the medical record.

Having arrived at this RFC assessment, the ALJ found at Step 4 that Lambakis had no past relevant work but ultimately found at Step 5 that Lambakis could

perform work available in the national economy as a cleaner, housekeeper; bakery worker, conveyor line; and produce weigher. (Tr. 978). Accordingly, the ALJ concluded that Lambakis did not meet the stringent standard for disability set by the Act and denied her claim. (Tr. 978-79).

This appeal followed. (Doc. 1). On appeal, Lambakis contends that the ALJ erred in his assessment of the treating source opinions. She further asserts that the ALJ failed to include limitations from both her severe and nonsevere impairments, as well as impairments that were documented that the ALJ did not discuss. This case is fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

## III.   Discussion

### A.   Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial

evidence is less than a preponderance of the evidence but more than a mere scintilla.

Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not

substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a

conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir.

1993). But in an adequately developed factual record, substantial evidence may be

"something less than the weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n,

383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our

review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency
> factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——,
> 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
> evidence standard, a court looks to an existing administrative record
> and asks whether it contains "sufficien[t] evidence" to support the
> agency's factual determinations. Consolidated Edison Co. v. NLRB,
> 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis
> deleted). And whatever the meaning of "substantial" in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial

evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777

F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d

Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence.

Rather our task is to simply determine whether substantial evidence supported the

ALJ's findings. However, we must also ascertain whether the ALJ's decision meets

the burden of articulation demanded by the courts to enable informed judicial

review. Simply put, "this Court requires the ALJ to set forth the reasons for his

decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000).

As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for
> his decision. 220 F.3d at 119. Conclusory statements . . . are
> insufficient. The ALJ must provide a "discussion of the evidence" and
> an "explanation of reasoning" for his conclusion sufficient to enable
> meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d
> 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ
> particular "magic" words: "Burnett does not require the ALJ to use
> particular language or adhere to a particular format in conducting his
> analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the

ALJ's decision under a deferential standard of review, but we must also give that

decision careful scrutiny to ensure that the rationale for the ALJ's actions is

sufficiently articulated to permit meaningful judicial review.

22

**B.** <u>**Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**</u>

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); <u>see also</u> 20 C.F.R. §404.1505(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant

is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013)

24

(quoting <u>Gormont v. Astrue</u>, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." <u>Titterington v. Barnhart</u>, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." <u>Cummings v. Colvin</u>, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. <u>Biller</u>, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such

as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could

26

perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id.</u> at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck v. Comm'r of Soc. Sec</u>., 181 F.3d 429, 433 (3d Cir. 1999).

### C.   <u>Legal Benchmarks for the ALJ's Assessment of Medical Opinions</u>

The Commissioner's regulations which applied at the time of this disability application also set standards for the evaluation of medical evidence and define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and

prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. §404.1527(c).

In deciding what weight to afford competing medical opinions and evidence, the ALJ is guided by factors outlined in 20 C.F.R. §404.1527(c). "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180 at *2. Treating sources have the closest ties to the claimant, and therefore their opinions generally entitled to more weight. <u>See</u> 20 C.F.R. §404.1527(c)(2) ("Generally, we give more weight to opinions from your treating sources..."); 20 C.F.R. §404.1502 (defining treating source). Under some circumstances, the medical opinion of a treating source may even be entitled to controlling weight. 20 C.F.R. §§04.1527(c)(2); <u>see also</u> SSR 96-2p, 1996 WL 374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where

28

applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. §404.1527(c). These benchmarks, which emphasize consideration of the nature of the treating relationship, also call for careful consideration of treating source opinions.

Indeed, this court has often addressed the weight which should be afforded to a treating source opinion in a Social Security disability appeals and emphasized the importance of such opinions for informed decision-making in this field. Recently, we aptly summarized the controlling legal benchmarks in this area in the following terms:

> Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight. See, e.g., Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 CFR § 404.1527(c)(2); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)). Oftentimes referred to as the "treating physician rule", this principle is codified at 20 CFR 404.1527(c)(2), and is widely accepted in the Third Circuit. Mason v. Shalala, 994 F.2d 1058 (3d Cir. 1993); See also Dorf v. Bowen, 794 F.2d 896 (3d Cir. 1986). The regulations also address the weight to be given a treating source's opinion: "If we find that a treating source's

> opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight." 20 CFR § 404.1527(c)(2). "A cardinal principle guiding disability, eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); See also Brownawell v. Commissioner of Social Security, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation, or lay opinion." Morales v. Apfel, supra at 317.

Morder v. Colvin, No. 3:16-CV-213, 2016 WL 6191892, at *10 (M.D. Pa. Oct. 24, 2016).

Thus, an ALJ may not unilaterally reject a treating source's opinion and substitute the judge's own lay judgment for that medical opinion. Instead, the ALJ typically may only discount such an opinion when it conflicts with other objective tests or examination results. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202–03 (3d Cir. 2008). Likewise, an ALJ may conclude that discrepancies between the treating source's medical opinion and the doctor's actual treatment notes justifies giving a treating source opinion little weight in a disability analysis. Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005). Finally, "an opinion from a treating source about what a claimant can still do which would seem to be well-supported by

the objective findings would not be entitled to controlling weight if there was other substantial evidence that the claimant engaged in activities that were inconsistent with the opinion." Tilton v. Colvin, 184 F.Supp.3d 135, 145 (M.D. Pa. 2016). However, in all instances in social security disability cases the ALJ's decision, including any ALJ judgments on the weight to be given to treating source opinions, must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704. Indeed, this principle applies with particular force to the opinion of a treating physician. See 20 C.F.R. §404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"). "Where a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (quoting Mason, 994 F.2d at 1066)); see also Morales, 225 F.3d at 317. Therefore, the failure on the part of an ALJ to fully articulate a rationale for rejecting the opinion of a treating source may compel a remand for further development and analysis of the record.

### D.   The ALJ's Decision is Supported by Substantial Evidence.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we

must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Lambakis was not disabled. Therefore, we will affirm this decision.

Lambakis raises a threefold challenge to this ALJ decision. First, Lambakis contends that the ALJ erred in failing to include limitations from her severe impairments in the RFC. She further argues that the ALJ failed to include limitations from the impairments identified as nonsevere, as well as other conditions documented in the record that the ALJ did not discuss. Finally, the plaintiff challenges the ALJ's treatment of the opinion evidence.

With respect to her claims regarding the treatment of opinion evidence, we first note that "[t]he ALJ–not treating or examining physicians or State agency consultants–must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. Further, in making this assessment of medical opinion evidence, "[a]n ALJ is [also] entitled generally to credit parts of an opinion without crediting

the entire opinion." <u>Durden</u>, 191 F.Supp.3d at 455. Finally, when there is no evidence of any credible medical opinion supporting a claimant's allegations of disability it is also well settled that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." <u>Cummings</u>, 129 F.Supp.3d at 214–15.

In the instant case, the plaintiff argues that the ALJ should have given great weight to the opinions of Mr. Hummel, Mr. Broker, and Dr. Spotts, and that the ALJ erred in affording the opinions of the state agency consultants greater weight. At the outset, we note that the opinion from Dr. Spotts does not encompass the relevant period for purposes of this decision. Indeed, Dr. Spotts rendered an opinion in December of 2013 opining that Lambakis was disabled from March of 2005 through 2015, and this disability period encompassed the time between March of 2016 and May of 2019. The ALJ afforded this opinion little weight, finding that it did not encompass the relevant time period, and further, that the determination of disability is one left for the Commissioner. Accordingly, we find no error in the weight afforded to this opinion.

With respect to the opinions of Mr. Hummel and Mr. Broker, we conclude that there is substantial evidence to support the ALJ's findings with respect to these opinions. While Lambakis contends that the ALJ should have given these opinions

great weight, and as such, included the limitations in these opinions in the RFC, in our view the ALJ adequately explained his reasoning for affording these opinions little weight and, accordingly, did not include their limitations. As to Mr. Broker's opinion that Lambakis was limited to part-time light work or full-time sedentary work, the ALJ found that this opinion was not consistent with objective examination findings showing a normal gait and station, 5/5 muscle strength in her upper and lower extremities, no muscle atrophy, and normal hip range of motion. Indeed, while the record contained evidence of some abnormal physical findings such as an antalgic gait and lumbar tenderness, the record is replete with normal examination findings of 5/5 strength, a normal gait and station, and normal range of motion. Accordingly, we discern no error with the ALJ's treatment of this opinion, and as such, the failure to include these limitations in the RFC.

Instead, the ALJ gave greater weight to the state agency consulting physician who opined that Lambakis could perform a range of light work, finding that this opinion was consistent with the objective findings of 5/5 strength in her extremities, a normal gait and station, negative straight leg raise tests, intact hand, and finger dexterity, and 5/5 grip strength. However, the ALJ noted that he afforded greater manipulative limitations and postural limitations to account for Lambakis' severe impairments. The ALJ also gave partial weight to Dr. Kneifati's opinion but found

that this opinion was not entirely consistent with the objective medical evidence in some respects, including Dr. Kniefati's sit, stand, and walk limitations. We conclude that the ALJ adequately discussed his reasoning for the treatment of these opinions, and these findings are supported by substantial evidence.

We reach a similar conclusion with respect to the ALJ's treatment of Mr. Hummel's opinion. In remanding the case from the district court, Magistrate Judge Schwab noted that the ALJ's treatment of Mr. Hummel's opinion in the first decision was inadequate. However, in this 2021 opinion, the ALJ detailed the findings of Mr. Hummel and explained that his findings were not entirely consistent with the evidence as a whole. On this score, the ALJ noted that Mr. Hummel's extreme limitations did not align with the objective findings of a normal rate, tone, and volume of speech, logical thought processes, and intact recent and remote memory. The ALJ further reasoned that Mr. Hummel's limitations were not consistent with the findings of the consultative psychologist, who found that Lambakis had clear speech, adequate receptive and expressive language skills, coherent thought processes, and adequate attention and concentration. In addition, the ALJ noted that Mr. Hummel's limitations were not consistent with the records of Lambakis' primary care provider who prescribed her mental health medications. The ALJ also

noted that Mr. Hummel's limitations began in December of 2017, over a year after the relevant period began. Thus, he afforded little weight to this opinion.

Instead, the ALJ afforded greater weight to Dr. Plowman, who found that Lambakis had no limitations in understanding, remembering, or carrying out simple instructions, her ability to make judgements on simple work-related decisions, her ability to interact appropriately with the public, or her ability to respond appropriately to changes in the work setting; and she had moderate limitations understanding, remember, or carrying out complex instructions, the ability to make judgments on complex work-related decisions, and her ability to interact appropriately with supervisors and coworkers. The ALJ reasoned that this opinion was consistent with the longitudinal records, which included objective findings of a euthymic mood, appropriate affect, clear speech, adequate receptive and language skills, and good insight and judgment. The ALJ further noted that Dr. Plowman's findings were consistent with physical therapy notes indicating that Lambakis was able to follow instructions and maintain adequate conversation, as well as notes from a Social Security representative which showed Lambakis had no difficulty understanding, talking, answering, or concentrating.

On this score, the ALJ was presented with several medical opinions, both in terms of the plaintiff's physical and mental impairments. Ultimately, the ALJ

discussed the weight afforded to each, citing to the objective medical evidence that supported or did not support the opinions. We again note that "[t]he ALJ – not treating or examining physicians or State agency consultants–must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. The ALJ also considered Lambakis' subjective complaints but found that they were inconsistent with the record as a whole. Accordingly, we find that the ALJ considered all of the medical evidence and adequately explained his reasoning for the weight given to the various medical opinions in this case to determine the range of work Lambakis could perform. Moreover, our independent review of the record discloses that substantial evidence; that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Pierce, 487 U.S. at 565, supported these ALJ findings.

Further, because we find that the ALJ adequately explained his reasoning for rejecting Mr. Hummel's opinion, we conclude that the ALJ did not err when he failed to include limitations for being off task, the need for unscheduled breaks, absenteeism, and limitations in concentration. Indeed, it is well settled that "where a limitation is supported by medical evidence, but is opposed by other evidence in the record, the ALJ has discretion to choose whether to include the limitation . . ." Zirnsak, 777 F.3d at 615. Here, the ALJ explained that these limitations were

contradicted by evidence in the record, such as findings of normal speech, coherent thought processes, intact recent and remote memory, and adequate concentration and attention. Accordingly, we find no error in the ALJ's failure to include these limitations in the RFC.[1]

The plaintiff further argues that the ALJ failed to include limitations from her nonsevere impairments, as well as impairments identified in the record that the ALJ failed to discuss. On this score, Lambakis contends that the ALJ failed to find her osteoarthritis of the knees and generalized anxiety disorder to be severe impairments, despite finding them severe in his first decision. The plaintiff further asserts that the

---

[1] Finally, we note that this case was governed by the medical opinion regulations which pre-dated March of 2017. Those regulations created a hierarchy of medical opinions, and typically called for greater weight to be given to acceptable medical sources, who typically were physicians. Acceptable medical sources included licensed physicians, licensed psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. See 20 C.F.R. § 404.1513. Conversely under these rules which governed Lambakis' case: "Licensed clinical social workers, therapists, public and private social welfare agency personnel, and rehabilitation counselors are not acceptable medical sources. SSR 06–03p; *see also* 20 C.F.R. § 404.1513." Barrows v. Berryhill, No. 3:17-CV-1383, 2018 WL 3543848, at *8 (M.D. Pa. June 28, 2018), report and recommendation adopted, No. 3:17-CV-1383, 2018 WL 3536722 (M.D. Pa. July 23, 2018). Therefore, under the medical opinion rules which governed this case, the opinions of physical therapists were generally given less weight.

ALJ did not include any limitations with respect to her stress incontinence and other back and knee impairments.

At the outset, the ALJ's failure to find the plaintiff's osteoarthritis and anxiety disorder to be severe impairments, in our view, at most constitutes harmless error. Social Security appeals are subject to harmless error analysis. Therefore:

> [A]ny evaluation of an administrative agency disability determination must also take into account the fundamental principle that: "'No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.'" Moua v. Colvin, 541 Fed.Appx. 794, 798 (10th Cir. 2013) quoting Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989). Thus, ALJ determinations in Social Security appeals are subject to harmless error analysis, Seaman v. Soc. Sec. Admin., 321 Fed.Appx. 134, 135 (3d Cir. 2009) and "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." Shinseki v. Sanders, 556 U.S. 396, 409, 129 S. Ct. 1696, 1706, 173 L.Ed. 2d 532 (2009).

Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *4 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017). In this regard "we apply harmless error analysis cautiously in the administrative review setting." Fischer–Ross v. Barnhart, 431 F.3d 729, 733 (10th Cir. 2005). However:

> In Social Security appeals courts may apply harmless error analysis when assessing the sufficiency of an ALJ's decision. Seaman v. Soc. Sec. Admin., 321 Fed.Appx. 134, 135 (3d Cir. 2009). "Under the harmless error rule, an error warrants remand if it prejudices a party's 'substantial rights.' An error implicates substantial rights if it likely

39

affects the outcome of the proceeding, or likely affects the 'perceived fairness, integrity, or public reputation of judicial proceedings.'" Hyer v. Colvin, 72 F. Supp. 3d 479, 494 (D. Del. 2014).

Harrison v. Berryhill, No. 3:17-CV-618, 2018 WL 2051691, at *5 (M.D. Pa. Apr. 17, 2018), report and recommendation adopted, No. 3:17-CV-0618, 2018 WL 2049924 (M.D. Pa. May 2, 2018).

Here, we cannot conclude that the failure to specifically include these impairments, or the failure to explicitly discuss them under these labels, likely affected the outcome of the proceeding. Rather, it is clear that the ALJ carefully considered and discussed the objective findings with respect to the plaintiff's anxiety and knee impairments. Indeed, the ALJ detailed the abnormal findings related to Lambakis' knees and anxiety. (Tr. 972). In fact, the ALJ specifically accounted for the plaintiff's knee impairment in considering whether it met or medically equaled a listing. (Tr. 967) The ALJ thoroughly discussed these findings, as well as the objectively normal findings relating to these impairments. (Tr. 972). Accordingly, given the ALJ's thorough treatment of the evidence relating to these impairments, we conclude that the failure to specifically label these impairments and find them severe is harmless error.

Moreover, to the extent the ALJ found other impairments to be nonsevere, the ALJ explained why he found these impairments to be nonsevere, including that the

40

record did not contain any evidence that the plaintiff experienced symptoms from these impairments. In fact, the plaintiff had not alleged any symptoms regarding these impairments during the hearing. Moreover, our review of the evidence reveals no records during the relevant period that document symptoms from the plaintiff's nonsevere impairments. Accordingly, we cannot conclude that the ALJ's failure to include some limitations from these impairments warrants a remand here.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.' " Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

**IV.**   **<u>Conclusion</u>**

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.


<u>*s/ Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge

DATED: June 29, 2023